Filed 9/22/25 (see concurring opinion)
**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re Miguel J., a Person Coming Under the Juvenile Court Law. | B339932 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>E.J.,<br><br>    Defendant and Appellant. | (Los Angeles County Super. Ct. No. 24PSJP00031A) |

APPEAL from orders of the Superior Court of Los Angeles County.  Stacy Wiese, Judge.  Affirmed.

Rita Himes, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Kimberly Roura, Deputy County Counsel, for Plaintiff and Respondent.

_____

**INTRODUCTION**

E.J. (Father) appeals from the juvenile court's jurisdictional findings and dispositional orders, declaring his child a dependent of the court under Welfare and Institutions Code[1] section 300, subdivisions (a) and (b), and removing the child from Father's custody. On appeal, Father challenges the jurisdictional findings based on domestic violence between the parents in the child's presence. He also challenges the removal order. We conclude the sustained domestic violence counts were supported by substantial evidence and adequately reflected the juvenile court's factual findings. We further conclude there was substantial evidence supporting the order removing the child from Father. We accordingly affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

**1. Section 300 petition**

Father and Maria O. (Mother) are the married parents of Miguel J., a boy born in November 2023. On March 10, 2024, the Los Angeles County Department of Children and Family Services (DCFS) received a referral alleging that the police were called to the family's home due to a domestic violence incident. According to the reporting party, after Father arrived home that morning highly intoxicated, Mother confronted him about his drinking. During a physical altercation between the parents, Father accidentally struck Miguel in the face while Mother was holding the child in her arms. Miguel did not sustain any injuries. As the parents continued to argue, Mother cut her foot on a glass object that fell to the floor. She also suffered a laceration to her

---

[1]    Unless otherwise stated, all further undesignated statutory references are to the Welfare and Institutions Code.

lip when Father slapped her. After the police arrived, Mother was granted an emergency protective order, but she did not want Father to leave the home because she relied on him to pay the rent. Father was arrested for domestic violence and child endangerment. In her statement to the police, Mother reported that Father used his hands to pull her, push her, and hit her approximately five times in the face, and that at some point during the altercation, he accidentally slapped the child.

In a March 19, 2024 interview with DCFS about the domestic violence incident, Mother indicated that she was upset because Father had been out drinking, which he often did on the weekends. According to Mother, when Father came home, they began arguing in the bedroom while she was holding Miguel. Father slapped Mother in the face. Father also accidentally hit Miguel in the face with an open hand when he hit Mother, but he did not injure the child. After Mother placed Miguel on the bed, she and Father continued fighting. Father struck Mother in the face, head, and other parts of her body, and she fought back to defend herself. At one point, Mother tried to call the police, but Father took away her cell phone. She also attempted to open the window coverings to call outside for help, but Father kept her from doing so. Mother sustained a cut on her foot when she stepped on a broken ceramic mug. She then ran out of the home, and upon seeing Mother, the apartment manager called the police. After receiving medical treatment, Mother stayed at a shelter with Miguel and obtained a seven-day protective order. The following week, both Mother and Father returned to the family's home.

In her initial interview with DCFS, Mother also described prior acts of domestic violence perpetrated by Father. She

recounted that, on December 24, 2023, Father slapped her multiple times in the face with an open hand while she sat on the bed breastfeeding Miguel. On that occasion, Father was drunk and upset that Mother did not prepare a holiday dinner. Mother also reported that Father slapped her several times when she was pregnant with Miguel. Mother did not believe, however, that Father would hurt her after their most recent altercation because he started to attend church and promised not to drink again. In describing the domestic violence between her and Father, Mother did not claim that Father ever targeted Miguel when he hit her.

In a March 22, 2024 interview with DCFS, Father stated that, the night before the domestic violence incident, he drank several beers and used a small amount of methamphetamine. He slept on the floor, and then tried to crawl into the bed with Mother and Miguel the next morning. In response, Mother began to kick Father and yell at him for coming home late. She also scratched Father, ripped his shirt, and attempted to pull the blinds from the bedroom window. Mother cut her foot when she broke a ceramic item and stepped on the broken pieces. Father initially denied hitting Mother during the incident. However, when DCFS referenced the police report documenting that Mother was seen bleeding from her lip, Father admitted that he slapped her. In response to DCFS's inquiry about whether he struck Miguel while slapping Mother, Father said that he had no recollection of hitting the child. Father further denied any prior incidents of domestic violence. During the interview, Father agreed to submit to an on-demand drug test, which was negative for drugs and alcohol.

On April 2, 2024, DCFS filed a dependency petition for Miguel. As later amended, the petition alleged Miguel was at

4

substantial risk of harm under section 300, subdivisions (a) and (b), based on the parents' history of violent altercations in the child's presence. It also alleged Miguel was at substantial risk of harm under section 300, subdivision (b), based on Father's abuse of methamphetamine and alcohol.

On April 17, 2024, the juvenile court held a detention hearing for Miguel. At the request of Father's counsel, the court admitted into evidence a letter showing that Father enrolled in a domestic violence program two days earlier. The court detained Miguel from Father and released the child to Mother. The court also ordered monitored visitation for Father to take place outside the family's home. The court set an adjudication hearing on the section 300 petition.

## 2. Jurisdictional and dispositional report

For its jurisdiction/disposition report, DCFS conducted additional interviews with Father and Mother about the allegations in the petition. In his interview, Father again indicated that Mother was the aggressor in the March 2024 domestic violence incident. As described by Father, Mother kicked him out of the bed because she was upset that he drank alcohol the night before. She later grabbed him by his shirt, scratched his back, and threw a ceramic mug onto the floor. Mother also pulled down the window curtains, and Father had to cover Miguel so that the curtains did not hit him. Father admitted that he slapped Mother during their altercation, but stated that "it wasn't much." He maintained that he did not hit Miguel. He further denied that there were any other incidents of domestic violence between him and Mother. However, Father later stated that sometimes he would "move her to the side" when Mother hit him, but he could not recall when this occurred.

5

While Father acknowledged that he used to drink alcohol and use methamphetamine, he asserted he was always sober when he arrived home. He claimed that he had not used alcohol or drugs since the March 2024 incident.

In her interview, Mother stated that, during the March 2024 incident, she argued with Father because he stayed out all night and then arrived home smelling of alcohol. She admitted that she kicked Father out of the bed and hit him on his back in anger. She also admitted that she threw a cup onto the floor and cut her foot on the broken pieces. Mother asserted that she and Father each slapped the other during the altercation, but she denied that he ever hit Miguel. She claimed that she lied to the police when she told them that Father accidentally hit Miguel because she was afraid they would take the child away. Mother further denied that they previously engaged in domestic violence, and asserted that she lied to the social worker about any prior altercations because she was angry at Father. Mother indicated that she knew Father drank alcohol, but was not aware that he used drugs. While Mother planned to continue the relationship, she acknowledged that Father needed to remain sober in order to return to the family's home.

DCFS also spoke with a maternal uncle and a paternal uncle who resided in the home. Neither relative was aware of any domestic violence between the parents prior to the March 2024 incident. In its report, DCFS noted that both Father and Mother were participating in domestic violence programs, and that Father continued to test negative for drugs and alcohol. Father was appropriate and attentive to Miguel during his monitored visits, but he was not consistent in his visitation. DCFS further noted that, despite Mother's recent denials, she

disclosed that Father accidentally hit Miguel during the March 2024 incident in her prior statements to law enforcement, the hospital social worker, and the medical hub clinic that examined the child. The hospital social worker also reported that, on the day of the incident, Miguel's face appeared to be red from being hit, and that Mother admitted this was not the first time Father hit her while she was holding the child. DCFS recommended that the juvenile court sustain the petition, remove Miguel from Father, and order services for both parents.

### 3. Jurisdictional and dispositional hearing

On June 12, 2024, the juvenile court held a combined jurisdictional and dispositional hearing. Counsel for DCFS and counsel for Miguel joined in asking the court to sustain the domestic violence counts in the petition under section 300, subdivisions (a) and (b), and the substance abuse count under subdivision (b). As to the domestic violence counts, counsel for DCFS argued that the child was within a zone of danger during the parents' physical altercations because Father actually hit Miguel during the March 2024 incident, and Mother disclosed there were other occasions when Father hit her while she was holding the child in her arms. As to the substance abuse count, counsel for DCFS asserted that Father admitted to using alcohol and methamphetamine the night before the March 2024 incident, and that Mother disclosed the domestic violence occurred when Father was under the influence of alcohol.

Mother's counsel requested that the court dismiss the domestic violence counts in the petition because Mother's most recent statements to DCFS showed that the March 2024 incident was an isolated occurrence, that Miguel was never hit or placed within a zone of danger, and that Mother acted appropriately by

7

calling the police and taking the child with her to a shelter. Father's counsel asked the court to dismiss the petition in its entirety. As to the domestic violence counts, his counsel argued that Mother admitted she lied when she initially claimed that Father hit Miguel during the March 2024 incident and engaged in other acts of domestic violence against her. Father's counsel also asserted that, while both parents admitted to slapping one another during the March 2024 incident, Mother instigated the altercation because she was angry at Father for staying out all night. As to the substance abuse counts, Father's counsel argued that there was no nexus between Father's drug use and a risk of harm to Miguel because Father never cared for the child while he was under the influence of alcohol or drugs.

After hearing the argument of counsel, the juvenile court sustained the domestic violence counts in the section 300 petition under subdivisions (a) and (b) of the statute, and the substance abuse count under subdivision (b). The court found Mother's initial description of the March 2024 altercation, including her statement that Father accidentally slapped Miguel when he slapped her, to be "extremely credible." The court also credited Mother's initial account that Father committed other acts of domestic violence against her when she was pregnant with Miguel and later when she was breastfeeding the child. In addition, the court found that Father's use of alcohol and methamphetamine was a "direct link to the abuse that was caused in this case" because Father was under the influence of those substances when he engaged in the March 2024 altercation with Mother.

Turning to disposition, the juvenile court declared Miguel a dependent of the court under section 300, subdivisions (a) and (b),

8

removed the child from Father's custody, and released him to Mother under the supervision of DCFS. The court ordered family maintenance services for Mother and enhancement services for Father. Father's case plan included drug and alcohol testing, a 52-week domestic violence program, parenting education, and individual counseling to address case issues.

On August 12, 2024, Father filed an appeal from the jurisdictional findings and dispositional orders.

### 4. Postappeal orders

Father requests this court take judicial notice of various documents that he asserts are related to the issue of whether his appeal is moot. We grant Father's request for judicial notice of the juvenile court's December 13, 2024, and March 14, 2025 minute orders in this case, but deny the request as to the remaining documents because they are not relevant to the mootness issue. (Evid. Code, §§ 452, subd. (d), 459, subd. (a).) These orders reflect that, at a six-month review hearing held on December 13, 2024, the juvenile court returned Miguel to both parents under the continued jurisdiction of the court. Then, on March 14, 2025, the juvenile court terminated dependency jurisdiction over Miguel with the child remaining in the custody of both parents.

### DISCUSSION

On appeal, Father challenges the jurisdictional findings based on his domestic violence with Mother and the order removing Miguel from his custody. Father argues the domestic violence count under section 300, subdivision (a), must be set aside because accidental harm inflicted on a child during an altercation between the parents does not support jurisdiction under subdivision (a) of the statute. Father further asserts the

9

sustained domestic violence counts under both subdivisions (a) and (b) of the statute must be modified, because they do not adequately reflect that his contact with Miguel during the March 2024 altercation with Mother was accidental.  In addition, Father contends the removal order was not supported by substantial evidence that showed a high probability that Miguel was at risk of serious harm if returned to Father's care.  We conclude that none of Father's claims has merit.

**1.      Mootness of Father's appeal**

We first address Father's argument that his appeal is not moot.  "A case becomes moot when subsequent events ' "render[] it impossible for [a] court, if it should decide the case in favor of [the appellant], to grant him any effect[ive] relief." ' "  (*In re D.P.* (2023) 14 Cal.5th 266, 276.)  While an order terminating jurisdiction generally renders an appeal from a prior order in a dependency proceeding moot, " 'dismissal for mootness in such circumstances is not automatic.' "  (*In re T.R.* (2024) 107 Cal.App.5th 206, 214.)  Rather, a reviewing court must " ' "decide on a case-by-case basis whether subsequent events in a juvenile dependency matter make a case moot and whether [its] decision would affect the outcome in a subsequent proceeding." ' "  (*In re D.P.*, at p. 276.)  Even where a case is moot, the court has discretion to reach the merits if the challenged order " 'could be prejudicial to the appellant or could potentially impact the current or future dependency proceedings,' or ' "could have other consequences for [the appellant], beyond jurisdiction." ' "  (*Id.* at p. 285.)

Here, the juvenile court made jurisdictional findings that Father does not challenge on appeal.  Moreover, the court has since returned Miguel to Father's custody and terminated its

10

jurisdiction over the child. Father nevertheless contends his appeal is not moot because (1) the challenged findings could permit a bypass of reunification services if Miguel or another child of Father is removed for physical abuse in a future dependency case, and (2) DCFS likely will refer Father for inclusion in the Child Abuse Central Index (CACI) based on the challenged findings in this case. DCFS agrees Father's appeal should not be dismissed as moot because a CACI report could be made based on the sustained allegations in the current petition.

As the parties recognize, the question of whether a court should presume a CACI referral has been or will be made and how such a presumption may apply to the issue of mootness is currently pending in the California Supreme Court in *In re S.R.*, review granted September 11, 2024, S285759. In this case, we need not decide whether Father's appeal is moot as a result of the uncontested jurisdictional findings or the subsequent termination of jurisdiction over Miguel. In light of DCFS's concession that the challenged findings and orders could have adverse consequences for Father beyond jurisdiction, we exercise our discretion to consider the merits of his appeal.

## 2. Jurisdictional findings based on the parents' domestic violence

### 2.1 Governing law

Section 300, subdivision (a), provides that a child comes within the jurisdiction of the juvenile court if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally . . . by the child's parent." (*Ibid*.) Under section 300, subdivision (b), the juvenile court may assert jurisdiction if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical

11

harm or illness, as a result of . . . [¶] . . . [t]he failure or inability of the child's parent . . . to adequately supervise or protect the child." (*Id.*, subd. (b)(1)(A).) "Although section 300 requires proof the child is subject to the defined risk of harm at the time of the jurisdiction hearing [citations], the court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child. [Citations.] The court may consider past events in deciding whether a child presently needs the court's protection." (*In re Cole L.* (2021) 70 Cal.App.5th 591, 601–602.) " 'A parent's " '[p]ast conduct may be probative of current conditions' if there is reason to believe that the conduct will continue." ' " (*In re J.A.* (2020) 47 Cal.App.5th 1036, 1048.)

We review challenges to the sufficiency of the evidence underlying jurisdictional findings for substantial evidence. (*In re I.J.* (2013) 56 Cal.4th 766, 773.) " ' "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." ' " (*Ibid.*)

**2.2 Substantial evidence supported jurisdiction under section 300, subdivision (a)**

In exercising jurisdiction over Miguel, the juvenile court sustained the following language in counts a-1 and b-1 of the section 300 petition: "[Mother and Father] have a history of engaging in violent altercations, in the child's presence. On 03/10/2024, the father repeatedly struck the mother's face with the father's hand, pushed and pulled the mother and pulled the mother's hair, while the mother held the child, resulting in the father striking the child's face. The mother sustained a bleeding

12

laceration to the mother's lip.  On 12/23/2023, the father repeatedly struck the mother's face with the father's hand.  On prior occasions, the [father] struck the mother with the father's hand, when the mother was pregnant with the child.  On 03/10/2024, the mother pulled the father's shirt, scratched and kicked the father, inflicting scratch marks to the father's face and neck.  The mother struck a dresser during the violent altercation, causing a mug to fall to the ground and break, resulting in the mother stepping on the broken glass, inflicting an injury to the mother's foot.  On 03/10/2024, the father was arrested for Inflict Corporal Injury Spouse/Cohabitant/Dating Relationship and Child Abuse:  Great Bodily Injury/Death.  Such violent conduct on the part of the mother and the father endangers the child's physical health and safety, creates a detrimental home environment and places the child at risk of serious physical harm, damage and danger."

Father argues that count a-1 must be set aside because section 300, subdivision (a), requires that a nonaccidental injury be inflicted on the child, and there was no evidence that Father nonaccidentally hit Miguel when he engaged in domestic violence against Mother during the March 2024 incident.  We conclude that jurisdiction was proper under section 300, subdivision (a).

It is well-established that exposure to domestic violence may serve as a valid basis for dependency jurisdiction.  (*In re Cole L.*, *supra*, 70 Cal.App.5th at p. 602; *In re M.M.* (2015) 240 Cal.App.4th 703, 720.)  "Although many cases based on exposure to domestic violence are filed under section 300, subdivision (b) [citations], section 300, subdivision (a) may also apply."  (*In re Giovanni F.* (2010) 184 Cal.App.4th 594, 599; accord, *In re Nathan E.* (2021) 61 Cal.App.5th 114, 121–122; *In re*

13

*M.M.*, at p. 720.)  Specifically, incidents of domestic violence may support a jurisdictional finding under section 300, subdivision (a), when the parents involve the children in the violence or engage in violence in the children's immediate presence.  (*In re Cole L.*, at p. 603.)  For example, subdivision (a) of the statute may apply where one parent strikes the other parent while he or she is holding a child, where the father strikes the mother while she is pregnant, or where the child intervenes during a fight between the parents.  (*In re Cole L.*, at p. 603; *In re M.M.*, at p. 720.)  In such cases, the parents' domestic violence exposes the child to a substantial risk of suffering nonaccidental harm.  (*In re Cole L.*, at p. 603.)

Here, the juvenile court reasonably could find that Father and Mother engaged in multiple acts of domestic violence that exposed Miguel to a substantial risk of nonaccidental harm.  In her initial account of the March 2024 incident, which the juvenile court found to be "extremely credible," Mother explained that she was holding Miguel in her arms during the altercation, and that Father accidentally hit the infant in the face with an open hand when he hit Mother.  Mother also disclosed that the March 2024 altercation was not the first instance of domestic violence between the parents.  In her initial interview with DCFS, Mother reported that Father slapped her several times when she was pregnant with Miguel.  Mother also recounted that, in December 2023, Father repeatedly hit her with an open hand while she was breastfeeding Miguel because he was upset that she did not prepare a holiday dinner.  When Mother spoke with the hospital social worker shortly after the March 2024 altercation, she similarly disclosed that there were other occasions when Father hit her while she was breastfeeding or holding the baby.

14

Accordingly, the domestic violence that occurred in this case falls squarely within the type of conduct that may support a finding of jurisdiction under section 300, subdivision (a). (*In re Cole L.*, *supra*, 70 Cal.App.5th at p. 603; *In re M.M.*, *supra*, 240 Cal.App.4th at p. 720.) The evidence showed that Miguel was not merely present in the home when the parents engaged in violent physical altercations. Rather, the child was at risk of suffering nonaccidental harm during the altercations because Mother was pregnant with Miguel or holding him in her arms on occasions when Father hit her. While it is undisputed that Father did not target Miguel for abuse during any of the domestic violent incidents, the juvenile court found that Father accidentally slapped the child when he slapped Mother during the March 2024 altercation. Although Mother later recanted her statements that Father hit Miguel during that incident and committed prior acts of violence against her, the juvenile court found Mother's earlier accounts to law enforcement and DCFS to be more credible. As a reviewing court, " ' "[w]e do not reweigh the evidence, evaluate the credibility of witnesses or resolve evidentiary conflicts." ' " (*In re M.M.*, at p. 721.) On this record, the juvenile court's exercise of jurisdiction under section 300, subdivision (a), was supported by substantial evidence.

### 2.3   The sustained domestic violence counts do not require modification

Father asserts that, if this court affirms the jurisdictional finding under section 300, subdivision (a), we must modify the language of counts a-1 and b-1 to state that Father accidentally hit Miguel during the March 2024 incident. Father argues that such modification is necessary because the sustained language is ambiguous about whether the hit was accidental, and substantial

15

evidence does not support a finding that Father nonaccidentally struck Miguel. DCFS contends that Father forfeited his claim by failing to request a modification in the juvenile court, and in any event, the sustained counts accurately reflect the court's findings. Even assuming, without deciding, that Father did not forfeit this claim by failing to object, we conclude that it lacks merit.

The sustained language in counts a-1 and b-1 states that "[o]n 03/10/2024, the father repeatedly struck the mother's face with the father's hand, pushed and pulled the mother and pulled the mother's hair, while the mother held the child, resulting in the father striking the child's face." In seeking a modification, Father claims that this language is ambiguous about whether his contact with Miguel's face was intentional or accidental. We disagree. The sustained counts do not suggest that Father was targeting Miguel when he struck the child in the face. Rather, language reflects that Father was targeting Mother, and that his act of striking Miguel resulted from Father striking, pushing, and pulling Mother while she was holding the child in her arms. This language was consistent with Mother's initial statements to the police and DCFS that Father used his hands to hit, push, and pull her during the March 2024 altercation, and that Father accidentally slapped the child in the face when he slapped Mother. This language also was consistent with the factual findings made by the juvenile court at the jurisdictional and dispositional hearing. As the court found in crediting Mother's original account, "They got into a fight, she had Miguel, Father smacked her and, unfortunately, slapped Miguel in the process." Thus, while the sustained language in counts a-1 and b-1 did not include the word "accidental" in describing Father's contact with

16

the child, it adequately reflects the evidence and findings at the hearing.

Father nevertheless contends that the domestic violence counts must be modified to protect him from unfair prejudice in a future dependency or CACI proceeding.  For instance, he argues that, if Miguel or another child is removed from his custody in a future dependency case due to physical abuse, the juvenile court might misconstrue the sustained language in the current petition to imply that Father physically abused Miguel, and rely on such language to bypass reunification services for him under section 361.5, subdivision (b)(3).[2]  Father also asserts that the domestic violence counts could be misconstrued as establishing that he engaged in conduct that constitutes child abuse or severe neglect that must be reported to CACI.  However, Father's claim that the jurisdictional findings in this case might be misinterpreted in a hypothetical future case is purely speculative. The record reflects that, in sustaining counts a-1 and b-1 in the section 300 petition, the juvenile court found that Father struck Miguel in the face when he intended to strike Mother during a violent physical altercation between the parents.  Because the sustained language in the petition is consistent with the findings and the evidence in this matter, no modification is necessary.

---

[2]     Section 361.5, subdivision (b)(3), permits the bypass of reunification services if  "the child or a sibling of the child has been previously adjudicated a dependent . . . as a result of physical or sexual abuse," and following the return of the child to parental custody, the child is again "being removed . . . due to additional physical or sexual abuse."

17

### 3. Dispositional order removing Miguel from Father's custody

#### 3.1 Governing law

" 'At the dispositional hearing, a dependent child may not be taken from the physical custody of the parent under section 361 unless the court finds there is clear and convincing evidence there is or would be a substantial danger to the child's physical health, safety, protection, or physical or emotional well-being if returned home, and that there are no reasonable means to protect the child's physical health without removing the child.' " (*In re D.P.* (2020) 44 Cal.App.5th 1058, 1065.) In determining whether to remove a child, the court "may consider the parent's past conduct and current circumstances, and the parent's response to the conditions that gave rise to juvenile court intervention." (*In re D.B.* (2018) 26 Cal.App.5th 320, 332.) The court "must also consider whether there are any reasonable protective measures and services that can be implemented to prevent the child's removal from the parent's physical custody." (*Ibid.*) "The parent need not be dangerous and the minor need not have been harmed before removal is appropriate. The focus of the statute is on averting harm to the child." *(In re T.W.* (2013) 214 Cal.App.4th 1154, 1163; accord, *In re D.B.*, at p. 328.)

We also review challenges to the sufficiency of the evidence supporting dispositional orders for substantial evidence. (*In re I.J., supra,* 56 Cal.4th at p. 773.) "When reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011.) "The

18

appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the findings or orders." (*In re E.E.* (2020) 49 Cal.App.5th 195, 206.)

### 3.2 Substantial evidence supported the removal order

Father challenges the sufficiency of the evidence supporting the dispositional order removing Miguel from his custody. He contends that the evidence was insufficient to establish that there was a high probability that Miguel faced a substantial risk of harm if returned to Father's care, and that there were no reasonable means to protect the child other than removal. We conclude that the order removing Miguel from Father was supported by substantial evidence.

The evidence showed that Father and Mother had a history of engaging in violent physical altercations that placed Miguel at substantial risk of harm. These incidents of domestic violence between the parents included Father hitting Mother several times when she was pregnant with Miguel, Father hitting Mother while she was breastfeeding the baby in December 2023, and Father hitting Mother while she was holding Miguel during their March 2024 altercation, which resulted in Father accidentally hitting the then four-month-old baby in the face. As of the June 2024 jurisdictional and dispositional hearing, Father was participating in a domestic violence program and testing negative for drugs and alcohol. He also had moved out of the family's home to comply with the juvenile court's detention order. However, throughout the dependency proceedings, Father continued to minimize his role in the domestic violence and to accuse Mother of being the aggressor in their physical altercations.

19

In his initial interview with DCFS, Father denied that he hit Mother during the March 2024 altercation, and only admitted to slapping her after the social worker pointed to the police report documenting that Mother was seen bleeding from her lip. In a subsequent interview, Father admitted that he slapped Mother during that incident, but he sought to downplay his conduct by asserting that "it wasn't much." Moreover, in each of his interviews with DCFS, Father denied that he hit Miguel, or engaged in any prior acts of domestic violence against Mother. While Mother initially reported that Father accidentally hit Miguel as he was hitting her during the March 2024 altercation, she later recanted these statements. Mother also recanted her statements that Father hit her on previous occasions when she was pregnant with Miguel or holding the baby in her arms.

On this record, the juvenile court reasonably could infer that, as of the jurisdictional and dispositional hearing, neither Father nor Mother had accepted responsibility for their actions in placing their young child at substantial risk of harm. The court also reasonably could infer that, since Mother and Father intended to maintain their relationship, there was a strong likelihood that the violence between them would continue. "Indeed, in a domestic violence situation, past violence is highly probative of the risk that violence may recur." (*In re L.B.* (2023) 88 Cal.App.5th 402, 411.) Moreover, "[a] parent's denial of domestic violence increases the risk of it recurring." (*In re V.L.* (2020) 54 Cal.App.5th 147, 156.) Under these circumstances, there was substantial evidence to support the juvenile court's finding that Miguel would be at substantial risk of serious harm if returned to Father's care, and that removal was the only reasonable means of protecting the child from such risk.

## DISPOSITION

The jurisdictional findings and dispositional orders are affirmed.

VIRAMONTES, J.

I CONCUR:

STRATTON, P. J.

**Wiley, J., Concurring in the result.**

Dependency lawyers and judges should know and use the four mental states defined by the Model Penal Code. These definitions have utility in every field of law in which culpability matters, which is to say in *every* field of law. Dependency law is no exception.

The four mental states are purpose, knowledge, recklessness, and negligence. (See *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 173 (*Cel-Tech*) [discussing the Model Penal Code's "four distinct culpable mental states"]; see Model Pen. Code, §2.02, subd. (2).)

Since their introduction in 1962, these four definitions have proven their non-partisan and value-free precision over the long run. The best legal minds in America took a decade to perfect these definitions to help clarify criminal law. For a generation, law students have been learning this material in their first-year criminal law course. (See *People v. Canales* (2024) 106 Cal.App.5th 1230, 1256, 1261–1262.)

The intellectual power and versatility of these definitions prompted the legal community to exploit their utility beyond criminal law. Courts have found these tools valuable, for instance, in fields as diverse as bankruptcy law, business law, and nuisance law. (E.g., *Bullock v. BankChampaign, N.A.* (2013) 569 U.S. 267, 273–274 [bankruptcy]; *Cel-Tech, supra,* 20 Cal.4th at pp. 172–173 [business]; *People v. Freetown Holdings Co.* (2024) 100 Cal.App.5th 1195, 1211–1213 [nuisance].)

Hypotheticals from *dependency* law illustrate how the four definitions gradate culpability with exactitude. We begin with the most culpable.

1. *Purpose.* The father's objective was to hit his child. Annoyed by the baby's ceaseless crying, the father struck the child on *purpose.*

2. *Knowledge.* The father did not have the goal of striking the child, but knew that would be the effect, as when the mother held the infant up as a shield. To hit the mother, the father swung through the shield, thereby hitting the child and then the

1

mother. The father *knew* he would hit his son, even though that was not his purpose.

3. *Recklessness.* The father knowingly assumed the risk that his attack on the mother could end up striking the child. The mother holding the child was a moving target, and the father's punch went astray and hit the child. The father's knowing acceptance of risk is the key to this *reckless* conduct.

4. *Negligence.* The father returned from his martial arts class, eager to demonstrate the speed striking he just learned. Standing closer to the child than would an ordinarily prudent person, the father unleashed a flurry of what he intended would be air punches. One hit the child. The father was *negligent.*

This four-category framework encourages clearer thinking. Clearer thinking can improve legal analysis in every field of law.

For instance, a question in this case is the proper statutory basis for the Department's action under section 300 of the Welfare and Institutions Code. Was it subdivision (a), subdivision (b), or both? Different consequences can follow each choice.

We look to the statutory language.

Subdivision (a) places a child in the court's jurisdiction if the child has suffered "serious physical harm inflicted *nonaccidentally* upon the child by the child's parent." (Welf. & Inst. Code, § 300, subd. (a), italics added.)

Subdivision (b), by contrast, requires serious physical harm from "failure or inability of the child's parent or guardian to *adequately supervise or protect* the child." (Welf. & Inst. Code, § 300, subd. (b)(1), italics added.)

Subdivision (b) seems to require only negligence.

By contrast, subdivision (a) seems to require recklessness, knowledge, or purpose. When a parent "nonaccidentally" harms a child, that seems to rule out negligence. But reckless conduct is blameworthy. It is the default mental state standard in criminal law. (Cf. Model Pen. Code, § 2.02, subd. (3); *id.* cmt. 5, p. 244 [recklessness is the "basic norm" of criminal liability according to the usual view of the common law].)

The essence of recklessness is *knowing acceptance of risk.* This concept is not hard to grasp.

2

It is playing Russian roulette, knowing there is a one in six chance a bullet is in the chamber when you pull the trigger.  (E.g., *Commonwealth v. Malone* (1946) 354 Pa. 180, 188, 47 A.2d 445, 447–449 [affirming reckless murder conviction for a Russian roulette killing where the shooter pointed the gun at a consenting friend].)

It is allowing your 150-pound vicious attack dog, unmuzzled, into contact with others, knowing that the dog poses a grave risk to human life and that he is too big and strong for you to control.  (See *People v. Knoller* (2007) 41 Cal.4th 139, 152, 158.*).*

It is driving onto busy streets after the mechanic just told you, "Your car is unsafe because the brakes are bad."

It is trying to hit your partner when she is holding your infant.

So recklessness would seem, at first glance, to be a sufficiently culpable mental state to satisfy subdivision (a).

But perhaps the matter is more complex.  Perhaps only knowledge or purpose would suffice for subdivision (a).  Perhaps recklessness would not be enough.

These are questions for another day, for the parties have not argued this case with the advantage of the four definitions from the Model Penal Code.  A holding on this issue would benefit from sustained adversarial focus.

Some points, however, are clear right now.  Dependency law is a field in which culpability matters.  These four definitions can lend superior clarity to legal analysis.  These tools are useful.  They are free.  Everyone benefits when legal analysis is more precise and hence more predictable.  This advance from the Model Penal Code can help.


WILEY, J.